# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

Christopher James Taylor,           :       Case No. 1:13CV1141

      Plaintiff,                :

vs.                           :       **MAGISTRATE'S REPORT**
                                   **AND RECOMMENDATION**

Commissioner of Social Security Administration,  :

      Defendant.               :

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § 1381, *et seq.* and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 18 & 19).  For the reasons set forth below, the Magistrate recommends that this Court remand the case to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g).

## PROCEDURAL BACKGROUND

Plaintiff previously applied for disability benefits.  His claim was denied on October 11, 2006 and he did not appeal.  His protective filing date is April 20, 2010 and his date last insured is December 31, 2004 (Docket No. 13, pp. 178-179 of 887).

On April 27, 2010, Plaintiff applied for SSI and any federally administered state supplementation under Title XVI, alleging that he became disabled on December 31, 2000[1] (Docket No. 13, pp. 130-132 of

---

[1]
     During the hearing, counsel amended Plaintiff's onset date of disability to April 20, 2010 (Docket No. 13, pp. 40-41 of 887).

887). His application was denied initially and upon reconsideration (Docket No. 13, pp. 75-77; 78-80; 86-88 of 887). On September 9, 2011, Administrative Law Judge (ALJ) Frederick Andreas conducted a hearing at which Plaintiff, represented by counsel, and Deborah Lee, a Vocational Expert (VE) appeared and testified (Docket No. 13, p. 29 of 887). The ALJ issued an unfavorable decision (Docket No. 13, pp. 20-28 of 887). The Appeals Council denied review of the ALJ's decision on March 19, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 13, pp. 5-8 of 887).

## FACTUAL BACKGROUND.

### A. PLAINTIFF'S TESTIMONY

Plaintiff was 5"9"tall and he weighed 155 pounds. Plaintiff was a high school graduate and he could read, write and complete basic mathematics. A divorcé and a veteran of the Persian Gulf War, Plaintiff was raising his minor child. Although Plaintiff had a driver's license, he drove sparingly because it was stressful and the jarring exacerbated his neck injury (Docket No. 13, pp. 37-39 of 887). Plaintiff's income was derived from Workers Compensation Insurance and the Veteran Administration (Docket No. 11, pp. 50; 51; 699 of 887).

During the course of employment as diesel mechanic for the Truckmen Corporation, Plaintiff sustained a shoulder injury on November 15, 1999. The pain in his shoulders radiated into his arms and hands, leaving them weak and numb. Plaintiff's attempt to return to his prior line of work after completing therapy was without success. Plaintiff contended that he was unable to perform a modified, sedentary workload since his neck and shoulder pain could easily be exacerbated by a lack of orthopedic and/or cervical support (Docket No. 13, pp. 39-40; 41; 54; 55 of 887).

Having undergone at least two shoulder surgeries, three neck surgeries and unlimited stints of physical therapy, Plaintiff still experienced substantial stiffness and shooting pain in his shoulders and neck that radiated to his head and caused migraine headaches. On an ascending scale with zero being nonexistent and

ten indicating severe pain, Plaintiff rated his pain level at eight to nine (Docket No. 13, pp. 41; 42 of 887).

During the two months preceding the hearing, Plaintiff began averaging two to three migraine headaches a week, each headache lasting from twenty minutes to three hours.  Nausea accompanied the headaches.  With his medical history, it was difficult to obtain medical treatment so he used cold packs, a dark room and quiet to alleviate the migraine (Docket No. 13, pp. 46-47 of 887).

Diagnosed with a depressive disorder, Plaintiff treated with a counselor at PSYCHCARE, a comprehensive behavioral care provider, bimonthly (Docket No. 13, p. 49 of 887; http://psychcare.com). Plaintiff acknowledged that he had difficulty remembering and concentrating; and that both difficulties affected his ability to drive or watch television (Docket No. 13, pp. 57-58 of 887).

Plaintiff's drug regimen included:

- Percocet®, a pain reliever (PHYSICIAN'S DESK REFERENCE, 2006 WL 68853).
- Naproxen, a nonsteroidal anti-inflammatory drug (PHYSICIAN'S DESK REFERENCE, 2006 WL 387492).
- Lyrica®, generally prescribed for the management of neuropathic pain associated with diabetic peripheral neuropathy (PHYSICIAN'S DESK REFERENCE, 2006 WL 384608).
- Amitriptyline, an antidepressant (www.rxlist.com.elavil-drug.htm).

The side effects from these combined medications--grogginess, sleepiness and numbness--made it difficult to get up daily and even more difficult one he got up to perform ordinary housework or drive (Docket No. 13, pp. 43-45; 51 of 887).  The medication even affected his ability to stand, sit and walk.  Plaintiff estimated that he could walk for ten to fifteen minutes; stand for five to ten minutes; and sit for twenty minutes (Docket No. 13, pp. 45-46 of 887).

Typically Plaintiff slept for three to four hours each night before his neck pain erupted (Docket No. 13, p. 51 of 887).  He arose at 5:00 A.M., fed his daughter and prepared her for school.  He then sat and listened to the radio while drinking coffee.  He performed household chores intermittently with breaks. Plaintiff paced himself when performing outside chores (Docket No. 13, pp. 51-52 of 887).  Plaintiff

3

suggested that during 75% of the day when he was awake, he had to support his neck (Docket No. 13, p. 56 of 887).  Plaintiff did perform stretches with rubber bands to prevent atrophy and maintain muscle tone (Docket No. 13, p. 58 of 887).

**2.     VE TESTIMONY**

The VE acknowledged her:  (1) role as an impartial witness; (2) familiarity with the Social Security Administration's definitions; and (3) duty to advise of any conflict between her testimony and the information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country (Docket No. 13, p. 60 of 887; Www.occupationalinfor.org.).

The VE categorized Plaintiff's past relevant work by exertional level, skill level and specific vocational preparation level or the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation:

| JOB/DOT | SKILL LEVEL | EXERTIONAL LEVEL | SVP |
|---------|-------------|------------------|-----|
| Diesel mechanic 625.381-010 | Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form.    20 C.F.R. § 404.1568(c). | Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying objects weighting up to 50 pounds. 20C.F.R. § 404.1568 (d). | 7–over 2 years up to an including four years. |
| Tow truck operator 919.663-026 | Semi-skilled work is more complex than unskilled work and distinctly simpler than the more highly skilled types of jobs. Such work requires more judgment than unskilled occupations and generally requires more than 30 days to learn.  20 C. F. R. §§ 404.1568(b). | Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.    20 C.F.R. § 404.1567(d). | 3–over one month up to and including three months. |

The ALJ posed the first hypothetical question as follows:

4

Assume an individual having Plaintiff's age, education and vocational background, who would be able to stand or walk for six out of eight hours; could [not climb using] ladders, ropes or scaffolds, and no overhead reaching.  Could this individual perform Plaintiff's past relevant work?

The VE responded "no" but proffered other jobs in the national economy that such a hypothetical individual would be able to perform:

| JOB/DOT NUMBER | NUMBER OF JOBS IN NORTHEAST OHIO/OHIO/NATIONALLY |
| --- | --- |
| Cashier<br><br>211.462-010 | 15,500/46,000/1,104,000 |
| Sales Clerk<br><br>290.477-014 | 53,000/148,000/4,400,000 |
| Security Guard<br><br>372.667-034 | 13,000/32,000/1 million |

(Docket No. 13, pp. 61-63 of 887; www.onetonline.org).

The ALJ posed a second hypothetical:

Assume the same individual, same age, education and background, and same residual functional capacity (RFC) except that this individual would be limited to sedentary work with limitations such as occasional standing; there are no sitting or environmental limitations; no overhead reaching, climbing, stooping, kneeling, crouching or crawling.  Would this person be able to perform any work in the national economy?

The VE answered that usually crouching, crawling, stooping, kneeling and crawling were not found in a sedentary RFC; nevertheless, there were examples of sedentary, unskilled work that this hypothetical individual could perform:

| JOB/DOT NUMBER | NUMBER OF JOBS IN NORTHEAST OHIO/OHIO/NATIONALLY |
| --- | --- |
| 10% of Production workers<br><br>713.687-018 | 250/1,800/28,000 |
| 6% of Cashiers (seated)<br><br>211.462-010 | 2,800/8,400/200,700 |
| Inspector<br><br>726.684-110 | 115/680/13,000 |

5

(Docket No. 13, pp. 63-64 of 887).

The VE explained that being off task more the 15% of the workday jeopardized an individual's prospects of maintaining employment (Docket No. 13, pp. 65-66 of 887).

In response to counsel's inquiry, the VE explained that there would be no jobs that the hypothetical individual could do if added to the second hypothetical was a limitation that the individual could not use his dominant hand.  If the jobs of cashier and sales clerk require frequent handling and the gate guard job required occasional handling, these jobs would be eliminated, thereby impacting the results for employment in hypothetical number one (Docket No. 13, pp. 67-68 of 887).

### MEDICAL EVIDENCE.

Plaintiff's problems date back to November 15, 1999, when a semi-tire fell on him.  Using his right hand to brace the collision, Plaintiff injured his right shoulder.  The following is a recap of the treatment Plaintiff received primarily to regulate his pain and psychological symptoms.

1.  **DR. MICHAEL J. JURENOVICH, D.O.**

Plaintiff began treating with Dr. Jurenovich on January 4, 2000.  Dr. Jurenovich diagnosed Plaintiff with positive impingement signs in his right shoulder and initially encouraged Plaintiff to start physical therapy (Docket No. 13, pp. 406-407 of 887).  Thereafter, Dr. Jurenovich provided treatment as follows:

- February 1, 2000–Dr. Jurenovich explained the dynamics of an arthroscopic procedure and sought approval from Workman's Compensation (Docket No. 13, p. 407 of 887).  On August 18, 2000, he performed the surgery and used an infusion pump to deliver medication to Plaintiff's body.  On September 12, 2000, Dr. Jurenovich removed Plaintiff's sutures and noted that he was progressing well (Docket No. 13, p. 408 of 887).
- October 3, 2000–Plaintiff was progressing well with the help of physical therapy (Docket No. 13, p. 410 of 887).  On October 20, 2000, Plaintiff underwent a nerve conduction velocity test of the bilateral upper extremities and the results were consistent with mild right carpal tunnel syndrome and acute right C6 cervical radiculopathy (Docket No. 11, pp. 510-511 of 887).  On October 24, 2000, Plaintiff complained of numbness in his arm (Docket No. 13, p. 411 of 887).
- November 13, 2000–Plaintiff's magnetic resonance imaging (MRI) report showed disc herniation at C5-6 impinging on the cord and broad-based disc protrusion at C6-7, also

6

impinging and posteriorly displacing the cord (Docket No. 13, p. 514 of 887). On November 21, 2000–Plaintiff had a positive MRI report, meaning that structural abnormalities were detected (Docket No. 13, p. 413 of 887).

- December 19, 2000– Dr. Jurenovich sought a second opinion because Plaintiff had ongoing numbness in his right arm and shoulder (Docket No. 13, p. 414 of 887).

- November 19, 2001–There was no evidence of a supraspinatus tear or other acute finding (Docket No. 13, pp. 505-506 of 887).

- February 26, 2002–Dr. Jurenovich prescribed Vioxx for pain and a muscle relaxer (Docket No. 13, p. 418 of 887).

- June 11, 2002–The MRI of the cervical spine showed postoperative changes due to the disc fusion at C5-C6, which resulted in cord flattening and mild disc bulging (Docket No. 13, pp. 501-504 of 887).

- August 28, 2002–Plaintiff underwent a fusion at C5-C6 disc level (Docket No. 11, pp. 484-487 of 887).

- October 4, 2002–Dr. Jurenovich referred Plaintiff for a nerve conduction study and the results were suggestive of a possible C5-C6 radiculopathy.  The left sided findings were normal (Docket No. 13, pp. 488-492 of 887).

- May 13, 2003–Plaintiff had neck surgery and complained of numbness in his left arm and hand in the fifth finger area (Docket No. 13, p. 423 of 887).

- October 7, 2003–Plaintiff's range of motion (ROM) in his right shoulder was very poor (Docket No. 13, p. 424 of 887).

- November 4, 2003–Plaintiff had limited ROM, pain and weakness in his right shoulder (Docket No. 13, p. 425 of 887).

- February 17, 2004–Plaintiff continued to have pain and numbness in the neck, shoulder and hand so Dr. Jurenovich ordered a functional capacity evaluation (Docket No. 13, p. 428 of 887).

- Plaintiff's condition was unchanged for more than a year.  He saw Dr. Jurenovich every four to six weeks for medication updates.  On or about September 6, 2005, Dr. Jurenovich began weaning Plaintiff from Percocet®, prescribing alternatives such as Ibuprofen, Motrin and Vicodin (Docket No. 13, pp. 429-444 of 887).

- The electrodiagnostic results showed minimally prolonged distal latency in the right median sensory and palmar nerves and sharp waves in the left deltoid and the left mid-cervical paraspinal muscles (Docket No.13, pp. 445-448 of 887).

- Dr. Jurenovich referred Plaintiff for diagnostic evaluation and on November 4, 2006, Dr. Carol S. Shamakian, M. D., a diagnostic radiologist, identified the presence of mild right side osteophyte formation at C6-C7 which caused mild right neural foraminal narrowing but not significant spinal canal stenosis (Docket No. 13, p. 445 of 887).

- May 20, 2008 through May 18, 2010--Dr. Jurenovich treated/rechecked Plaintiff every four to six weeks.  During this time, Dr. Jurenovich treated Plaintiff for chronic pain from ongoing neck and/or right shoulder impingement and the occasional migraine headache.  The pain was chronic and Plaintiff had poor ROM with these body parts.  Pain management continued including cortisone injections, a medication regimen including Percocet® and physical therapy.  Notably, on November 28, 2008, Dr. Jurenovich performed arthroscopy of the right shoulder (Docket No. 13, pp. 543-544 of 887). On March 5, 2009, he removed a 4cm abscess on Plaintiff's right shoulder (Docket No. 13, pp.  515-538; 541-542 of  887).  And on March

1, 2010, the results from the MRI showed no evidence of full thickness retear (Docket No. 11, p. 547 of 887).

- May 24, 2010–Dr. Morris W. Pulliam, a neurosurgeon, reported to Dr. Jurenovich that a repeat MRI was warranted.  Dr. Pulliam suggested that Plaintiff's headache symptoms were more likely a migraine rather than cervical spondylosis (Docket No. 13, p. 654-655 of 887).

- June 15, 2010–Dr. Jurenovich reviewed all of Plaintiff's systems and reaffirmed his diagnoses of right shoulder sprain; right impingement syndrome; cervical stenosis; right supraspinatus tear; right infraspinatus tear; and right glenoid labrum tear.  It was suggested that Plaintiff's migraine headaches were also part of Plaintiff's problems at that time.  Pain medication was prescribed (Docket No. 13, p. 634 of 887).

- January 4, 2011–Dr. Jurenovich completed the MEDICAL SOURCE STATEMENT OF CLAIMANT'S ABILITY TO PERFORM WORK-RELATED PHYSICAL ACTIVITIES in which he concluded the following:
    - Plaintiff could lift/carry less than ten pounds occasionally.
    - Plaintiff had no sitting impairment.
    - Plaintiff could push/pull limited to the upper extremities and less than ten pounds.
    - Plaintiff could occasionally stand but never climb, stoop, kneel, crouch or crawl.
    - Plaintiff could, without limitation, handle, see, hear, speak and perform tasks using his hands (Docket No. 13, p. 657-658 of 887).

- January 25, 2011–Dr. Jurenovich referred Plaintiff for a MRI of the left and right shoulders.  The results of the imaging on the left were indicative of derangement but mild acromioclavicular joint (AC joint) arthrosis (Docket No. 13, p. 646 of 887).  Results from the imaging on the right were indicative of postoperative changes; of note was the moderate grad partial bursal side tear in the fibers of the supraspinatus tendon (Docket No. 13, pp. 647-648 of 887).

- May 2, 2011–Dr. Jurenovich noted that Plaintiff's condition had not changed–he still had significant shoulder pain–and the pain medication was continued (Docket No. 13, p. 638 of 887).

- June 15, 2011–Dr. Robert J. Brocker, Jr., M.D., a neuropsychiatrist, performed a consultative examination at Dr. Jurenovich's request.  Dr. Brocker diagnosed Plaintiff with cervical disc displacement and he wanted to add "reflex sympathetic dystrophy."  Naprelan, a nonsteroidal anti-inflammatory drug, was added to Plaintiff's drug regimen (Docket No. 13, pp. 665-667 of 887; www.healthgrades.com/physician/dr-robert-brocker; www.webmd.com).

- August 9, 2011–Plaintiff continued to have shoulder pain with decreased ROM and his pain pills were continued (Docket No. 13, p. 677 of 887).

2.   ST. JOSEPH HEALTH CENTER.

- August 31, 2000–Plaintiff underwent another arthroscopy to correct the impingement syndrome of the right shoulder and degenerative arthritis of the right AC joint (Docket No. 13, pp. 251-257 of 887).

- December 27, 2000--Dr. Shaukat Hayat, M. D., a neurologist, reviewed Plaintiff's MRI which showed evidence of a herniated disc with the compromise of the spinal cord (Docket No. 11, p. 508 of 887).

- June 15, 2001–Dr. Hayat performed a cervical discectomy and fusion at C5-C6 (Docket No.

8

13, pp. 233-245; 416 of 887).

- July 24, 2001–examination of the cervical spine showed normal alignment and disc spacing of the cervical spine with surgical fusion of the bodies at C5 and C6 (Docket No. 13, p. 231 of 887).
- August 5, 2001–Plaintiff's wounded thumb was cleaned and sutured (Docket No. 13, pp. 248-249 of 887).
- September 10, 2001–in the cervical spine, there was diagnostic evidence of surgical fusion with posterior spur formation impinging on the left lateral recess and causing mild spinal stenosis (Docket No. 13, p. 230 of 887).
- March 18, 2003–chest X-ray showed no abnormality (Docket No. 13, p. 229 of 887).
- April 11, 2003–four views of the cervical spine showed normal alignment and disc spacing with no bony abnormalities. There was evidence of anterior plate and screw fixation of the bodies of C6 and C7 (Docket No. 13, p. 228 of 887).
- December 19, 2007–the MRI results confirmed the partial thickness undersurface supraspinatus tear (Docket No. 13, p. 548 of 887).

**3.** **DR. DAVID J. HOREJA, M. D.**

On October 13, 2003, Plaintiff underwent a MRI of the cervical spine and right shoulder. Dr. Horeja observed:

- No significant disc bulge at C3-4.
- Mild, broad based left paramedial disc protrusion.
- There is a low-signal, moderately prominent bone formation along the left paramedial region of the fused C5-6 disc.
- There are new signal abnormalities within the vertebrae and disc consistent with the surgery.
- There is no sign of focal rotator cuff tear (Docket No. 13, pp. 371-373 of 887).

**4.** **DR. PETER GERSZTEN, M.D., NEUROSURGEON.**

On March 31, 2003, Plaintiff was hospitalized after suffering for eighteen months with persistent neck, right shoulder and right upper extremity pain. Dr. Gerszten performed a diskectomy at C6-C7. Plaintiff was advised to wear his cervical collar, refrain from pushing, pulling, lifting or dragging anything greater than 5 pounds and refrain from driving (Docket No. 13, pp. 390-396 of 887). The follow-up care produced the following:

- April 12, 2003–Plaintiff reported that his left arm pain had worsened (Docket No. 13, pp. 392-393 of 887).
- June 6, 2003–Dr. Gerszten identified a median nerve problem. At that time, Plaintiff's left

arm pain was slowly improving and he no longer had left hand swelling. Plans were made to taper his consumption of analgesics (Docket No. 13, p. 387 of 887).

- February 25, 2004-results from the myelogram performed on this date was compared to the myelogram administered on December 29, 2003. The results were negative for infection, tumor and problems with the spine. Plaintiff complained of severe, persistent left leg pain. Dr. Gerszten recommended physical therapy (Docket No. 13, pp. 374 -375 of 887).

5. **DR. PAUL C. SHIN, M.D.**

Dr. Gerszten referred Plaintiff to Dr. Paul C. Shin, M.D., to address the neck pain. On November 3, 2004, Dr. Shin conducted a clinical interview and determined that:

- Plaintiff had cervical degenerative disc disease, status post cervical fusion, cervical radiculopathy and a chronic cervical strain/sprain component.
- Plaintiff should undergo a trial of epidural steroid injections.
- Plaintiff should be weaned from Percocet® (Docket No. 13, pp. 368-369 of 887).

6. **PHYSICAL THERAPY/OCCUPATIONAL THERAPY**.

On February 25, 2004, Jayne Sabo, a licensed occupational therapist (LOT), performed a thorough functional capacity evaluation and determined that Plaintiff had the ability to perform light physical demand jobs, limited to occasional lifting and work below knuckle level. Plaintiff required a "shift and stand option" and he was able to perform handling and fingering in the left hand. Plaintiff's range of movement was considered within normal limits (Docket No. 13, pp. 379-385 of 887).

On December 9 and 13, 2004, LOT Jill Wilson, evaluated Plaintiff for physical therapy and recommended massage and therapeutic exercise. On January 15, 2005, Plaintiff was discharged after attending only two sessions (Docket No. 13, pp. 260-265 of 887).

Plaintiff initiated treatment through physical therapy on December 24, 2009. On March 15, 2010, the therapist recommended that therapy be discontinued because Plaintiff had missed three of six appointments (Docket No.13, pp. 578-607 of 887).

7. **CLEVELAND CLINIC HEALTH SYSTEM**.

- May 12, 2005--Examination of the cervical spine showed (1) status post anterior fusion of

C5/6 with an interbody fusion graft and with evidence of solid fusion; (2) status post anterior fusion of C5 and C7 with plate and screws with a 5mm increase in the space between the spinous processes of C6 and C7 from the extension to the flexion position (Docket No. 13, pp. 270-271; 347 of 887).

- July 25, 2005, August 15, 2005 and August 22, 2005--A paravertebral block at the C6-C7 level bilaterally was administered (Docket No. 13, pp. 274, 278-279; 287-288; 326-332; 333-339; 340-346 of 887).  Plaintiff experienced a 45-50% improvement after the injections (Docket No. 13, p. 358 of 887).
- September 8, 2005--Plaintiff complained that he was experiencing pain (Docket No. 13, p. 358 of 887).
- October 21, 2005--Diagnosed with cervical myalgia, Plaintiff underwent a computed tomographic (CT) scan of the cervical spine.  The results showed no evidence of central canal stenosis; no defects in the lateral cervical contrast column and no obvious intradural abnormality (Docket No. 13, pp. 281-285; 320-325 of 887).
- October 25, 2005--Plaintiff's severe headache was treated with a narcotic pain reliever.  A myelogram was administered (Docket No. 13, pp. 291-298; 299; 311 of 887).
- October 26, 2005--A small amount of blood was used to seal off a puncture site identified on the myelogram (Docket No. 13, pp. 309-317 of 887).

### 8.  VOCWORKS

On January 4, 2005, a physical therapist employed by VOCWORKS, a case management, vocational rehabilitation, customized job placement and wellness service provider, conducted the functional capacities assessment based on Plaintiff's history and the results from several psychometric tests.  The physical therapist suggested that Plaintiff would benefit from a work conditioning program and further recommended that he perform work designated in the sedentary to light strength range that permitted him to switch positions on an occasional basis and prohibited him from reaching overhead or engaging in repetitive lifting above waist level (Docket No. 13, pp. 362- 366 of 887; Www.vocworks.com).

### 9.  CURO CLINIC'S DR. JOEL D. SIEGAL, M. D., A NEUROSURGEON, AND DR. TERRY PUET, M. D., A REHABILITATION MEDICINE/PAIN MANAGEMENT SPECIALIST.

On August 14, 2006, Dr. Siegal conducted the initial examination to consider Plaintiff's complaints of neck and arm pain.  It was his impression that Plaintiff had cervical spondylosis, cervical herniated nucleus pulposis, left upper extremity radiculopathy and possible carpal tunnel syndrome.  Further diagnostic tests were ordered to rule out pseudo arthrosis at C6-C7 (Docket No. 13, pp. 350- 351 of 887).

11

- September 12, 2007–Dr. Siegal performed a discectomy at C6-7 and C4-5 (Docket No. 13, pp. 457-461 of 887).
- July 8, 2009–Dr. Siegal noted that the results from Plaintiff's CT scan showed a C6-7 pseudo arthrosis.  There was no residual disc bulge or protrusion and there was mild bony posterior spurring at C5-C6 (Docket No. 13, pp. 549; 553-557 of 887).

Dr. Puet supplemented Dr. Siegal's surgeries with pain management treatment as follows:

- March 3, 2008–Prescription for Lyrica was increased.  Initially, Dr. Puet claimed that Plaintiff did not meet the criteria for fibromyalgia because of the lack of problems below the waist (Docket No. 11, pp. 475-477 of 887).
- April 28, 2008–He administered trigger point injections at two of the worst trigger points (Docket No. 11, pp. 472-473 of 887).
- June, 9, 2008–Dr. Puet diagnosed Plaintiff with fibromyalgia and his trigger points were more localized in the surgical areas.  Having tried all options to manage pain, Dr. Puet decided to "stay the course," continuing Plaintiff on Vicodin and Lyrica (Docket No. 11, pp. 470-471 of 887).
- December 3, 2008–Dr. Puet conducted a physical examination and diagnosed Plaintiff with a cervical herniated nucleus pulposis, fibromyalgia and right rotator cuff injury.  He continued Plaintiff on Lyrica and Amitriptyline while adding Flexeril®, a medication used to relieve muscle spasm associated with acute, painful musculoskeletal conditions (Docket No. 13, p. 462 of 887; PHYSICIAN'S DESK REFERENCE, 2006 WL 372509 (2006)).
- February 2, 2009–Dr. Puet continued the combination of Lyrica, Amitriptyline and Flexeril®.  This combination was helpful in relieving pain (Docket No. 13, pp. 551-552 of 887).
- May 28, 2009–Dr. Puet continued the prescriptions for Lyrica and Percocet®, but he switched Plaintiff from Flexeril® to Skelaxin®, a medication used as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions (Docket No. 11, pp. 466-467 of 887; PHYSICIAN'S DESK REFERENCE, 2006 WL 372344 (2006)).

## 10.  PHYSICAL RFC ASSESSMENT

Dr. Charles Derrow based the following conclusions on all of the evidence and determined that Plaintiff's symptoms were attributable to a medically determinable impairment and that his claims were credible.  Dr. Derrow opined that Plaintiff's symptoms produced the following limitations:

- Occasionally lift and/or carry twenty pounds.
- Frequently lift and/or carry ten pounds.
- Stand and/or walk for a total of about six hours in an eight-hour workday.
- Sit for about six hours in an eight-hour workday.
- Push and/or pull unlimitedly, other than shown for lift and/or carry.
- Never climb using a ladder/rope/scaffold.
- Reach in all directions including overhead, limited to occasionally with left arm only (Docket

No. 13, pp. 397-403 of 887).

**11.    PSYCHCARE**

Plaintiff underwent a clinical interview/diagnostic assessment on May 6, 2010.  Dr. Terence Heltzel,

Ph. D., concluded that Plaintiff needed psychiatric assistance to monitor his consumption of psychotropic

drugs and  psychotherapy to improve emotional functioning and pain management.  Dr. Heltzel determined

that the basic patterns evolving from the results of the MINNESOTA MULTIPHASIC PERSONALITY INVENTORY-

2 showed a degree of psychopathology in the mild range; the BURNS ANXIETY test results fell within the

severe range and the score on the BURNS DEPRESSION CHECKLIST fell within the range of mild depression.

Using the American Psychiatric Association's standard criteria for classifying mental disorders, Dr. Heltzel

categorized Plaintiff's mental disorder accordingly:

| AXIS AND WHAT IT MEASURES: | DR. HELTZEL'S DIAGNOSES: |
|---|---|
| One represents acute symptoms that need treatment | Depressive disorder, not otherwise specified; pain disorder, chronic, associated with both psychological factors. |
| Two assesses personality disorders and intellectual disabilities. | Diagnoses deferred. |
| Three describes physical problems that may be relevant to diagnosing and treating mental disorders. | Neck injury; chronic pain. |
| Four psychosocial and environmental factors contributing to the disorder. | Chronic pain and functional limitations. |
| Global Assessment of Functioning (GAF) assigns a clinical judgment in numerical fashion to the individual's overall functioning level.  Impairments in psychological, social and occupational/school functioning are considered.  The scale ranges from zero (inadequate information) to 100 (superior functioning). | 55-- Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational ,or school functioning (ex: few friends, conflicts with peers/co-workers). |

(Docket No. 13, pp. 610-619 of 887; DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

30 (4th ed. 1994).

Plaintiff presented to PSYCHCARE on March 28, 2011 for follow-up evaluations on his progress on psychotropic medications.  Dr. Warren S. Roger, M.D., a psychiatrist, opined that Plaintiff was doing well on the current medication regimen.  The prescription for an antidepressant, Remeron, was continued (Docket No. 13, p. 660 of 887).

On June 21, 2011, Dr. Heltzel opined that Plaintiff needed to continue psychotherapy and medication management (Docket No. 13, pp. 661-662 of 887).

### 13.    DR. MARY-HELENE MASSULLO, D.O., GENERAL SURGEON.

On June 10, 2010, Dr. Massullo made some interesting conclusions after conducting the clinical interview:

- Plaintiff abused tobacco.
- Plaintiff was hypertensive.
- Plaintiff had tattoos.
- Plaintiff also had telangiectatic (dilation of the previously existing small or terminal vessels of a part) lesions.  STEDMAN'S MEDICAL DICTIONARY 401250 (27th ed. 2000).
- Plaintiff had an injury to his left ankle with two surgical interventions.
- Plaintiff's dental repair was poor.
- Per Plaintiff, chronic arthralgia in bilateral elbows, shoulder and hands existed.

Dr. Massullo conducted manual muscle testing and determined that Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees, feet and great toes against maximal resistance; his grasp, manipulation, pinch and fine coordination were within a normal range; the ROM in his shoulders and ankles was abnormal and the ROM in his cervical spine, elbows, wrists, hands/fingers, hips and knees was within the normal range (Docket No. 13, pp. 621-624; 625-628 of 887; www.healthgrades.com/physician/dr-mary-helene-massullo).

### 14.    DR. BRUCE COTUGNO, M. D., NEUROPSYCHIATRIST.

On or about January 28, 2011, Dr. Cotugno performed a nerve conduction test, the results of which revealed mild bilateral median neuropathy suggestive of mild bilateral carpal tunnel syndrome.  The

electromyography results showed chronic neurogenic findings in bilateral C5-C7 and C8 and T1 nerve root

distributions (Docket No. 13, pp. 642-645 of 887; www.healthgrades.com/physician/dr-bruce-cotugno).

15.   **DEPARTMENT OF VETERAN'S AFFAIRS**

Plaintiff was subjected to a number of studies, medication reconciliations and treatments.  Here is

summary of the most significant tests/treatments:

| DATE | TEST/TREATMENT | RESULTS |
|---|---|---|
| November 18, 2009 | X-ray of the ankle | Mild  spurring  of  the tip of the medial malleolus likely related to prior ligamentous injury (Docket No. 13, pp. 685-686 of 887). |
| February 19, 2010 | X-ray of the lumbrosacral spine | Mild degenerative disc disease at L5-S1 (Docket No 13, pp. 684-685 of 887). |
| May 27, 2010 | Electroneuromyography | The results showed evidence of a severe, remote, left peroneal mononeuropathy at the ankle (Docket No. 13, pp. 882-883 of 887). |
| September 23, 2010 | Left ankle nerve decompression | Pain was resolved (Docket No. 13, pp. 872-879 of 887). |
| February 15, 2011 | Electrocardiogram | Although  the  sinus  rhythm  was normal; other anomalies were present (Docket No. 13, pp. 884 of 887). |
| March 14, 2011 | Biopsy and colonoscopy | Hyperplastic  polyp (Docket No. 13, pp.691-692; 868-869 of 887) |
| June 6, 2011 | Esophagogastroduodenoscopy | Minimal distal esophagitis and minimal hiatal hernia (Docket No. 13, pp. 742-756 of 887). |
| February 1, 2012 | X-ray of the lumbrosacral spine | Stable L5-S1 degenerative disc disease (Docket No. 13, pp. 682-683 of 887). |

**STEPS TO EVALUATE ENTITLEMENT TO SSI**

To establish entitlement to SSI, a claimant must prove that she or he is incapable of performing

substantial gainful activity due to a medically determinable physical or mental impairment that can be

expected to result in death or to last for at least twelve months.  42 U. S. C. § 1382c (a)(3)(A) (2000); 20

C.F.R. § 416.909 (2000); *Murphy v. Secretary of Health and Human Services*, 801 F. 2d 182, 183 (6ᵗʰ Cir. 1986); *Richardson v. Heckler*, 750 F. 2d 506, 509 (6ᵗʰ Cir. 1984).  The claimant must show that his/her impairment results from anatomical, physiological or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U. S. C. § 1382c (a)(3)(C) (Thomson Reuters/West 2008); 20 C.F.R. §§ 416.913, 416.928 (Thomson/Reuters West 2008).

To determine disability, the ALJ uses a five-step sequential evaluation process.  20 C.F.R. § 416.920 (a)-(f) (2000) (Thomson Reuters/West 2008).  The ALJ considers:  (1) whether claimant is working and whether that work constitutes substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether claimant has an impairment which meets or equals the durational requirements listed in Appendix 1 of Subpart P, Regulations No. 4, (4) whether claimant can perform past relevant work, and (5) if claimant cannot perform his/her past relevant work, then his/her RFC, age, education and past work experience are considered to determine whether other jobs exist in significant numbers that accommodate him/her.  20 C.F.R. § 416.920 (Thomson Reuters/West 2008).

A finding of disability requires an affirmative finding at step three or a negative finding at step five. The claimant bears the burden of proof at steps one to four, after which the burden shifts to the Commissioner at step five.  The ALJ's analysis at step five typically involves an evaluation of the claimant's RFC to perform a particular category of work (i.e., sedentary, light, medium, heavy or very heavy work), in combination with an application of the grid to determine whether an individual of the claimant's age, education and work experience could engage in substantial gainful activity.  *See* 20 C.F.R. Pt. 404, Subpart P, App. 2 (Thomson Reuters/West 2008).

### SUMMARY OF THE ALJ'S DECISION.

Upon consideration of the entire record, the ALJ made the following findings.

- Plaintiff had not engaged in work activity since April 20, 2010, the application date.

16

- Plaintiff had the following severe impairments:
  - Right impingement syndrome.
  - Right rotator cuff tear.
  - Cervical stenosis.
  - Status post cervical fusion.
  - Bone spurs.
  - Right supra spinatus tear.
  - Herniated discs atC5-C7.
  - Migraines.
  None of these impairments, individually or in combination with each other met or medically equaled the severity of one of the listed impairments in 20 C.F. R. Part 404, Appendix 1 to Subpart P.
- Plaintiff had the RFC to perform sedentary work except that he was limited to overhead reaching, no climbing, kneeling, crouching or crawling.
- Plaintiff had at least a high school education and was able to communicate in English.
- Plaintiff, a younger individual aged 18-44, was unable to perform any past relevant work.
- Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.
- Plaintiff was not under a disability as defined in the Act since April 20, 2014, the date the application was filed (Docket No. 13, pp. 20-27 of 887).

## STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the

17

administrative record as a whole. *Id.* (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## DISCUSSION

Plaintiff contends that the ALJ violated the treating physician rule by failing to provide good reasons for rejecting Dr. Jurenovich's functional limitations and the ALJ failed to articulate any functional limitations imposed by his migraine headaches.

Defendant contends that the ALJ properly assessed Dr. Jurenovich's opinion and the ALJ appropriately evaluated the evidence related to Plaintiff's migraines.

## 1. THE TREATING PHYSICIAN.

Plaintiff argues that the ALJ failed to give controlling weight to the opinions of Dr. Jurenovich, particularly his assessment of Plaintiff's physical restrictions.

### A. THE LAW.

Under the treating physician rule, the SSA gives deference to the views of the physician who has engaged in the primary treatment of a claimant. *Cruse v. Commissioner of Social Security,* 502 F.3d 532, 540 (6th Cir. 2007) (*see Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-530 (6th Cir. 1997) (*citing* 20 C.F.R. § 404.1527(d)(2) (1997)). A physician is considered a treating source if the claimant sees the physician with a frequency that is consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. *Id*. at 540 (alteration in original) (*quoting* 20 C.F.R. § 404.1502). A treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Farmer v. Astrue,* 2008 WL 343254, 6 (S. D. Ohio 2008) (*citing Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986)). A treating physician's opinion is to be

18

given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is consistent with the other substantial evidence in the record. *Id.* (*citing Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994)).

To apply the correct legal standards, the ALJ's decision to reject the treating physician's opinion must be based on good and specific reasons why the treating physician rule is inapplicable. *Allums v. Commissioner of Social Security,* 2013 WL 5437046, * 4 (N.D.Ohio,2013).  An ALJ who chooses not to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion, including (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id.*  Failure to provide good and specific reasons why the treating physician is not entitled to controlling weight is grounds for remand.  *Id.*

### B.    THE APPLICATION

Aside from ordering radiographic and diagnostic tests and consultative examinations, Dr. Jurenovich diagnosed Plaintiff's neurological impairments, performed surgeries and managed drug therapy for Plaintiff's chronically malcontrolled neck and shoulder pain over a span of at least ten years.  The medical records that supplement his treatment notes include voluminous clinical and laboratory diagnostic techniques which define the nature of Plaintiff's impairments.  It is unrefuted that Dr. Jurenovich was a treating source as defined at 20 C.F.R. § 404.1502(d) and that the treatment was consistent with the medical practice of orthopedics.

There is a rebuttable presumption that a treating source's opinions should receive controlling weight. The ALJ must assign specific weight to the opinion of each treating source and if the weight assigned is not

controlling, then give good reasons for not giving these opinions controlling weight.  Here, it is clear that the ALJ adopted Dr. Jurenovich's diagnoses as well as his references to Plaintiff's difficulty siting and handling, (Docket No. 13, pp. 24; 25 of 887); however, the ALJ's decision lacks clarity as to the weight the ALJ attributed to Dr. Jurenovich's opinions and whether there were good reasons for discounting Dr. Jurenovich's opinions.  Simply, the ALJ failed to follow the Commissioner's rules on assessing a treating source.

Plaintiff has the right to have his disability determination made according to the correct legal principles.  There is a reasonable basis for doubt that the ALJ used the correct legal principles in applying the substantial evidence standard in making a finding of no disability.  This case is appropriate for remand to the Commissioner for use of the appropriate standard of review for treating source determinations and a determination of the weight that should be given to Dr. Jurenovich's opinions.  The ALJ should conduct such review and prepare a decision that has sufficient specificity to determine if Dr. Jurenovich's opinions alter the results of Plaintiff's entitlement to disability and allow for meaningful judicial review.

### 2.    MIGRAINE HEADACHES.

The ALJ included Plaintiff's migraine headaches among his severe impairments; however, the migraine headaches, individually or in combination with each other, did not meet or medically equal the severity of a listed impairment.  Plaintiff argues that Commissioner erred since the ALJ found the migraine headaches severe impairments at step two of the sequential evaluation but failed to include this impairment in Plaintiff's RFC.

### A.    THE LAW

In determining the severity of an impairment(s) at step 2 of the sequential evaluation process set out in 20 C.F.R. § 404.1520, evidence about the functionally limiting effects of an individual's impairment(s) must be evaluated in order to assess the effect of the impairment(s) on the individual's ability to do basic work activities.  TITLES II AND XVI: CONSIDERING ALLEGATIONS OF PAIN AND OTHER SYMPTOMS IN DETERMINING

WHETHER A MEDICALLY DETERMINABLE IMPAIRMENT IS SEVERE, SSR 96-3p, 1996 WL 374181, * 2 (1996). Because a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must be considered at this step of the sequential evaluation process, provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms. *Id.*

When the claimant has a severe impairment(s), but the symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in Appendix 1 of this subpart, SSA will consider the limiting effects of all the claimant's impairment(s), even those that are not severe, in determining RFC. 20 C.F.R. § 404.1545(e) (Thomson Reuters 2013). The RFC circumscribes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from-though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Commissioner of Social Security*, 276 F.3d 235, 240 (6th Cir.2002).

### B. THE APPLICATION.

The Magistrate recognizes that Plaintiff's migraine headache may not affect his functional capacity to do work. In fact, the presence of this severe impairment does not automatically have an impact on his RFC. Plaintiff may have a different RFC depending on other impairments, pain and other symptoms.

The claimant carries the burden of proving the limitations that factor into the Commissioner's RFC. Here, Plaintiff testified at the administrative hearing that he was experiencing migraines two to three times weekly and that each occurrence lasted twenty minutes to three hours. He reported the symptoms to his treating and attending physicians who occasionally established a clear diagnosis of migraine headache. While the medical record documents preceding the onset date of disability suggest that Plaintiff had migraine headaches, the records reflect conservative treatment and there is no evidence of even mild abnormalities resulting therefrom. By way of example, Plaintiff sought emergency treatment for a headache on several

21

occasions in 2005 and Plaintiff complained to Dr. Jurenovich that these headaches occurred especially after being subjected to some diagnostic tests.  As a general rule, he failed to include his headaches when seeking pain relief or the symptoms were dismissed with a narcotic pain reliever (Docket No. 13, pp. 298-299; 308; 310; 313; 515-538; 541-542; 634; 665 of  887).  Neither the treating nor attending physicians reconsidered the diagnosis of migraine headaches or prescribed one of the medications traditionally prescribed for the prevention and treatment of subsequent attacks.

After the onset date of disability, Plaintiff appeared to abandon complaints of migraine headaches to his physicians.  There is minimal evidence documenting his complaints or his physician's treatment.  When documenting Plaintiff's ability to perform work-related physical activities, Dr. Jurenovich never made a supportive reference to the medical records and any functional limitations related to the migraine headaches (Docket No. 13, pp. 657-658 of 887).  Furthermore, the ALJ factored in Plaintiff's daily activities which appeared to be inconsistent with his claim that he is disabled.  Plaintiff is the primary caretaker for his daughter.  He explicitly admitted that he performed household chores and yard work, albeit at his own pace and on a less frequent basis; he prepared the family meals, drove sparingly, shopped for his household and watched television.  He even performed some exercises to maintain muscle tone.

Based on this evidence, the ALJ reasonably concluded that Plaintiff's migraine headache pain was not of the severity to preclude work activity for the reasons that there is no evidence that the headaches are chronic or that they intensify in severity or frequency under any circumstances.  The ALJ discussed how he arrived at the RFC for sedentary work and his explanation was based on medical records that suggest Plaintiff's migraines are adequately managed.  The evidence in the record does not persuade the Magistrate that Plaintiff's migraine headaches precluded him from engaging in substantial gainful activity.  Reversal is not warranted on the basis of assessing the functional limitations at step four of the sequential evaluation.

**CONCLUSION**

For the foregoing reasons, it is recommended that the Court reverse and remand this case to the Commissioner, pursuant to sentence 4 of 42 U. S. C. § 405(g), to conduct review of Dr. Jurenovich's opinions consistent with its own rules and determine if based on this review and other evidence, Plaintiff is disabled and entitled to disability benefits.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date:   March 14, 2014

**NOTICE**

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.